JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
STEPHANIE G. HERRERA (State Bar No. 313887)
stephanie.herrera@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

BETHANY W. KRISTOVICH (State Bar No. 241891)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendants*
*OpenAI Foundation, OpenAI OpCo, LLC,*
*OpenAI Holdings, LLC, OpenAI Group PBC,*
*and Samuel Altman*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| HIS MAJESTY THE KING IN RIGHT OF THE PROVINCE OF BRITISH COLUMBIA and BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 59 (PEACE RIVER SOUTH), individually,<br><br>Plaintiffs,<br><br>vs.<br><br>SAMUEL ALTMAN, OPENAI FOUNDATION (F/K/A OPENAI, INC.), OPENAI OPCO, LLC, OPENAI HOLDINGS, LLC, and OPENAI GROUP PBC,<br><br>Defendants. | Case No. 3:26-cv-10743-JSC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR FORUM NON CONVENIENS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: December 17, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Jacqueline S. Corley<br>Crtrm.: 8th (19th Floor)<br><br>[Filed concurrently: Declaration of Bethany W. Kristovich; Declaration of Julia K. Lockhart; (Proposed) Order] |

# TABLE OF CONTENTS

Page


NOTICE OF MOTION AND MOTION TO DISMISS FOR FORUM NON CONVENIENS ....... 6

MEMORANDUM OF POINTS AND AUTHORITIES ....... 6

I. INTRODUCTION ....... 6

II. BACKGROUND ....... 8

A. The Tumbler Ridge Tragedy and the Ongoing RCMP Investigation ....... 8

B. Van Rootselaar's Troubled History and Mental Health ....... 10

C. Van Rootselaar's Access to Firearms and Ammunition ....... 11

D. The RCMP's Return of Firearms to Van Rootselaar's Home ....... 12

E. The British Columbia Government Response to the Shooting ....... 13

F. The Canadian Media and Public Response to the Shooting ....... 14

G. The Province Files Suit in California ....... 15

III. ARGUMENT ....... 16

A. British Columbia Is an Available and Adequate Forum ....... 17

B. The Balance of Private and Public Interest Factors Favors Dismissal ....... 18

1. The Private Interest Factors Weigh in Favor of British Columbia ....... 18

2. British Columbia's Predominant Interest and Considerations of International Comity Favor a British Columbia Forum ....... 23

3. Plaintiffs' Choice of Forum Is Entitled to Limited Deference ....... 29

IV. CONCLUSION ....... 29

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re Air Crash at Madrid, Spain, on August 20, 2008*,
893 F. Supp. 2d 1020 (C.D. Cal. 2011).....22

*In re Air Crash Over Mid-Atlantic on June 1, 2009*,
760 F. Supp. 2d 832 (N.D. Cal. 2010).....20, 26

*Andersen v. Stability AI Ltd.*,
No. 23-cv-00201-WHO (LJC), 2026 WL 1244041 (N.D. Cal. May 6, 2026).....21

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011).....17

*Doud v. Kochai*,
No. C 12-6061 MEJ, 2013 WL 5313701 (N.D. Cal. Sept. 23, 2013).....19

*Etaliq, Inc. v. Cisco Sys., Inc.*,
No. CV 11-3672 GAF, 2011 WL 13220445 (C.D. Cal. July 20, 2011).....26

*Gallego v. Garcia*,
No. 07CV1185-MMA (LSP), 2010 WL 2354585 (S.D. Cal. June 9, 2010).....21

*Gulf Oil Corp. v. Gilbert,*
330 U.S. 501, 511 (1947).....22, 28

*Her Majesty the Queen in Right of the Province of British Columbia v. Bailey*,
No. 90-cv-1118 (W.D. Wash. filed Aug. 10, 1990).....17

*Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson*,
No. 76-457, 433 F. Supp. 410 (D. Or. 1977).....17

*Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson*,
597 F.2d 1161 (9th Cir. 1979).....17

*Juniper Networks, Inc. v. Andrade*,
No. 20-cv-02360-BLF, 2021 WL 3514103 (N.D. Cal. Aug. 10, 2021).....23, 27

*Kryvicky v. Scandinavian Airlines Sys.*,
807 F.2d 514 (6th Cir. 1986).....26

*Lisa, S.A. v. Gutierrez Mayorga*,
441 F. Supp. 2d 1233 (S.D. Fla. 2006).....26

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,
583 F.3d 656 (9th Cir. 2009).....26

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137 (9th Cir. 2001) ........ *passim*

*Ministry of Health, Province of Ont., Can. v. Shiley Inc.*,
858 F. Supp. 1426 (C.D. Cal. 1994) ........ 18, 26, 28, 29

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*,
176 F.R.D. 329 (C.D. Cal. 1997) ........ 24

*Nibirutech Ltd v. Jang*,
No. C 14-3091 PJH, 2015 WL 831465 (N.D. Cal. Feb. 23, 2015) ........ 19

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981) ........ *passim*

*Quackenbush v. Allstate Ins. Co.*,
517 U.S. 706 (1996) ........ 16

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
119 F.3d 935 (11th Cir. 1997) ........ 28

*RJR Nabisco v. Eur. Cmty.*,
579 U.S. 325 (2016) ........ 25

*Seguros Universales, S.A. v. Microsoft Corp.*,
32 F. Supp. 3d 1242 (S.D. Fla. 2014) ........ 25, 28

*Silverlake Park LLC v. Stewart Title Guar. Co.*,
No. 2:17-cv-03291-CAS-AGRx, 2025 WL 241118 (C.D. Cal. Jan. 10, 2025) ........ 27

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007) ........ 16

*Umeda v. Tesla Inc.*,
No. 20-cv-02926-SVK, 2020 WL 5653496 (N.D. Cal. Sept. 23, 2020) ........ 20

*In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984*,
634 F. Supp. 842 (S.D.N.Y. 1986) ........ 25

*In re Vioxx Prods. Liab. Litig.*,
448 F. Supp. 2d 741 (E.D. La. 2006) ........ 25

*Vivendi SA v. T-Mobile USA Inc.*,
586 F.3d 689 (9th Cir. 2009) ........ 29

*West v. Multibanco Comermex, S.A.*,
807 F.2d 820 (9th Cir. 1987) ........ 24

**STATE CASES**

*Bullis v. Sec. Pac. Nat'l Bank*,
21 Cal. 3d 801 (1978) ........ 24

**BRITISH COLUMBIA CASES**

*British Columbia v. Juul Labs, Inc.*,
Vancouver Registry No. 259345 (B.C.S.C.) ........ 17

*British Columbia v. McKinsey & Co., Inc. United States*,
Vancouver Registry No. S-2111367 (B.C.S.C.) ........ 17, 27

**FEDERAL STATUTES AND RULES**

28 U.S.C. § 1781 ........ 21

Fed. R. Civ. P. 45(c) ........ 22

**STATE STATUTES AND RULES**

Cal. Welf. & Inst. Code § 8103(f)(1)(A) ........ 24

**CANADA AND BRITISH COLUMBIA RULES**

B.C. Supreme Court Civil Rule 22-5 (8) ........ 28

Firearms Act, S.C. 1995, c. 39 (Can.) ........ 24

Mental Health Act, R.S.B.C. 1996, c. 288, s. 22 ........ 11

Opioid Damages and Health Care Costs Recovery Act ........ 27

**<u>NOTICE OF MOTION AND MOTION TO DISMISS FOR FORUM NON CONVENIENS</u>**

PLEASE TAKE NOTICE that on December 17, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard, Defendants OpenAI Foundation, OpenAI OpCo, LLC, OpenAI Holdings, LLC, OpenAI Group PBC, and Samuel Altman will and hereby do move to dismiss the complaint of His Majesty the King in Right of the Province of British Columbia and Board of Education of School District No. 59 (Peace River South) based on forum non conveniens.

The Court should dismiss based on forum non conveniens because British Columbia is an adequate alternative forum, and the private and public interest factors strongly favor a British Columbia forum, for this action by British Columbian government entities. *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142–43 (9th Cir. 2001). Defendants' motion is based on this Notice of Motion and Motion and accompanying Memorandum; the Declaration of Bethany W. Kristovich and exhibits thereto; the Declaration of Julia K. Lockhart and exhibits thereto; all pleadings on file in this matter; and such argument as the Court may consider in connection with this Motion.

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

## I. <u>INTRODUCTION</u>

This lawsuit appears to mark the first time that the Province of British Columbia has sued a U.S. company in a United States court. The lawsuit concerns a horrific shooting at Tumbler Ridge Secondary School in British Columbia, Canada. OpenAI's thoughts remain with the victims, their families, and the entire community in the wake of this incomprehensible tragedy.

The Province and the School District's tort claims—seeking to place all the blame on OpenAI for an unspeakable crime by a deeply troubled British Columbian teenager after systemic failures by local law enforcement, public health care providers, and educational institutions—are not viable. Nor are the claims against Sam Altman, who was not personally involved in the June 2025 review of the shooter's ChatGPT account or the decision whether to refer her account to Canadian law enforcement. Defendants will address the merits of these claims in the ultimate forum, but the threshold question and the focus of this Motion is where the Crown and the School District's claims should be heard. The Court should dismiss based on forum non conveniens because claims by the British Columbian government entities should be heard in British Columbia, where multiple

Canadian and British Columbian proceedings concerning the shooting are ongoing.

The Province's own courts plainly are an available and adequate alternative forum for its claims. Indeed, the Province has pursued similar tort claims in its own courts—including against U.S. companies for alleged harms to Canadians. So the key questions under the forum non conveniens doctrine are where the parties can access evidence and which forum has the greater interest. The answer to both questions is British Columbia.

First, ***the parties' access to evidence*** favors British Columbia. Hundreds of third-party witnesses and sources of evidence that are directly relevant to causation are in British Columbia and beyond the Court's compulsory process. This includes more than fifty Canadian law enforcement officers involved in the post-shooting investigation; more than 100 Canadian first responders, educators, and witnesses to the horrific events; many other Canadians who were aware of the shooter's violent history, access to guns, and serious mental health issues before the shooting, including her family, local law enforcement officers, local school officials, and local mental health care providers; and all evidence related to the Province's extraordinary damages claims, which include $200 million of construction funding to build a new school and community health center in Tumbler Ridge. Litigating in California will materially impair the availability of this highly relevant third-party evidence. By contrast, OpenAI will produce documents electronically to all plaintiffs, regardless of forum, and OpenAI will make employees available for testimony in this litigation, whether it proceeds in this District or in Canada, subject to all applicable discovery and trial rules.

Second, ***the public interest*** strongly favors British Columbia. British Columbia's interest in this action goes well beyond the typical interest in adjudicating claims arising from injuries that occur within a forum's borders—as the filing of this lawsuit by the British Columbian government makes plain. This lawsuit will require the Court and San Francisco jurors to adjudicate claims by a foreign sovereign—as alleged, His Majesty King Charles III—and to assess the role of Canadian law enforcement, Canadian firearms regulations, and numerous British Columbian governmental institutions in the events that preceded and followed the shooting. Issues will include: the British Columbia public health system's release of the shooter from multiple involuntary psychiatric hospitalizations without ongoing supervision; Canadian law enforcement's decisions to permit the

shooter to retain a firearms license and to return firearms (including one of the weapons used in the shooting) to her home despite her psychiatric problems and violent criminal history; the School District's failure to address the shooter dropping out of school; and national policies regarding online safety in Canada. These complex issues should be considered by courts and jurors in the affected community—not in California—especially given that federal and provincial government entities are actively addressing the same issues in multiple proceedings in British Columbia.

Because British Columbia is an available and adequate forum, and the balance of private and public interests strongly favors litigating all claims arising from the shooting there, the Court should dismiss for forum non conveniens. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22, 257 (1981); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142–43 (9th Cir. 2001).

## II. <u>BACKGROUND</u>

The Province's lawsuit leaves no doubt that British Columbia is the center of gravity for claims arising from the Tumbler Ridge tragedy. Its claims implicate hundreds of third-party witnesses and sources of evidence in British Columbia that are highly relevant to the issue of causation—like the individual plaintiffs' claims—and also put in issue countless additional third-party witnesses and sources of evidence that are relevant to the Province's alleged damages.

### A. <u>The Tumbler Ridge Tragedy and the Ongoing RCMP Investigation</u>

On February 10, 2026, eighteen-year-old Jesse Van Rootselaar[1] shot and killed her mother and eleven-year-old half-brother at their home in Tumbler Ridge. B.C. Compl. ¶ 25. She then drove to Tumbler Ridge Secondary School where she opened fire on students and educators, perpetrating "one of the deadliest mass shootings in Canadian history." *Id.*

The Royal Canadian Mounted Police ("RCMP"), an independent entity that contracts with the Province to provide policing services in Tumbler Ridge, has been investigating the shooting in British Columbia since it occurred. *See id.* ¶ 8; Lockhart Decl. ¶ 7. Immediately after the shooting, the RCMP obtained warrants to search Van Rootselaar's home, vehicle, and electronic devices. Lockhart Decl. Ex. B at 1–4, 37–50. The warrant applications, which a British Columbia court

[1] Van Rootselaar was a transgender woman. This brief uses her preferred pronouns (she/her/hers).

recently released with heavy redactions following litigation by the Canadian press, confirm that a large number of witnesses and sources of evidence are in British Columbia. Lockhart Decl. ¶ 8; *see generally id.* Ex. B. This includes more than fifty RCMP officers who have firsthand knowledge of the investigation. *See* Lockhart Decl. Ex. B at 5, 15–23, 82, 89–95, 99, 109, 115, 117, 125. This also includes the more than 100 percipient witnesses from whom the RCMP has obtained statements, including students, educators, first responders, and neighbors. *See id.* at 17, 22, 27, 70; Kristovich Decl. Ex. 4 at 2. RCMP officers with personal knowledge of the investigation and witnesses who have provided statements are in British Columbia.

The RCMP also has been coordinating with U.S. law enforcement in a months-long investigation into James Cody Bryant, culminating in a joint announcement on October 6, 2026, that the U.S. Attorney for the Western District of Washington has charged Bryant with conspiracy to murder persons in a foreign country for encouraging and aiding Van Rootselaar's plan and agreeing to livestream the attack. *See* Kristovich Decl. Exs. 1, 3. According to charging documents, that investigation began after the RCMP obtained and shared with U.S. law enforcement evidence of Van Rootselaar's activities on the platform Discord. *Id.* Ex. 2 at 5:4–19. The RCMP reports that it has used "all available legal processes to secure information from multiple social media and digital platforms" that it continues to analyze in British Columbia. *Id.* Ex. 3 at 2. The RCMP's criminal investigation into the shooting and Bryant's role "remains ongoing and the possibility of further charges being pursued in Canada remains under active consideration." *Id.* Ex. 3 at 3. All evidence that the RCMP has collected regarding the role of Bryant and other potential co-conspirators, as well as the digital evidence collected from multiple social media and digital platforms, is in the RCMP's possession in British Columbia. *Id.* Ex. 4 at 1.

The RCMP also has collected extensive physical evidence that it continues to analyze and maintain under seal in British Columbia. The warrant applications indicate that the RCMP is tracing and forensically examining firearms recovered from the crime scenes, including multiple firearms recovered from "insecure" storage at Van Rootselaar's residence. Lockhart Decl. Ex. B at 32; Kristovich Decl. Ex. 4 at 1. RCMP seized two laptops, two cell phones, a camera and camcorder, and memory cards from Van Rootselaar's residence, Lockhart Decl. Ex. B at 91–92, and sought

authorization to search for "[d]ocuments and notes, such as suicide notes, manifestos, [and] journal entries," *id.* Ex. B at 59. Warrant applications also detail extensive video evidence captured at the school, including CCTV recordings and bodycam footage. *Id.* Ex. B at 70; Kristovich Decl. Ex. 4 at 1. RCMP holds all this physical evidence in British Columbia.

**B. <u>Van Rootselaar's Troubled History and Mental Health</u>**

Public information demonstrates that Van Rootselaar's mental health problems and violent ideations were known to her family, her teachers, local law enforcement, healthcare professionals, and others in the Tumbler Ridge community prior to the shooting.

Van Rootselaar's surviving family members, all of whom appear to reside in Canada, witnessed her turbulent upbringing. In custody proceedings, the Supreme Court of British Columbia found that Van Rootselaar and her siblings "led an almost nomadic life." *See* Kristovich Decl. Ex. 5, para. 8. Van Rootselaar's mother and stepfather frequently uprooted the family, "with multiple moves . . . between Newfoundland, Grand Cache and Powell River, British Columbia." *Id.* A few months before the shooting, Van Rootselaar alleged in an online post that her stepfather attempted suicide in front of her when she was "very little." *Id.* Ex. 6 at 7–8. Her stepfather, who reportedly lives in Alberta and disputes that allegation, says Van Rootselaar "was a troubled child" and claims he "did what [he] could" for her. *Id.* Ex. 6 at 9; *id.* Ex. 7 at 4. According to her mother, Van Rootselaar "hurt[] [her] siblings" as she was growing up. *Id.* Ex. 6 at 3. Van Rootselaar's stepfather, biological father, step-siblings, and maternal grandparents, who have information about Van Rootselaar's early life and the family circumstances leading up to the shooting, are in Canada. *See id.* Exs. 7, 8, 15.

Van Rootselaar was enrolled in the Tumbler Ridge school system until she dropped out in approximately 2022 around the age of 14. *Id.* Ex. 17 at 4. Before she dropped out, educators witnessed concerning behavior. In 2015, when Van Rootselaar was around seven years old, local school officials sought to have her tested for a behavioral disorder. *Id.* Ex. 6 at 3. Also, School District No. 59's published reports from that period reflect systemic failures in addressing students' psychological and emotional needs. *See id.* Ex. 10 at 4 ("Approximately 30-35% of our students do not feel welcome in our schools while fewer feel that our schools are places students feel they

belong."). According to Van Rootselaar, Tumbler Ridge Secondary School "messed up" her and her family's education. *Id.* Ex. 2 at 30:22–23. And when Van Rootselaar dropped out, it appears no one intervened to keep her in school, despite school officials' obligations under the District's policies and British Columbia's Duty to Report regulations. *Id.* Exs. 11, 12. The school officials responsible for Van Rootselaar's education and safety, and documents pertaining to her attendance, behavioral issues, withdrawal, and school officials' response, are in British Columbia.

In 2023, Van Rootselaar deliberately set fire to her house. *Id.* Ex. 13 at 2. Neighbors told reporters that she was "trying to kill [her] own family." *Id.* "[E]veryone on the street saw the blaze." *Id.* Witnesses to this attempted homicide are in British Columbia.

After the arson, Van Rootselaar was involuntarily hospitalized under British Columbia's Mental Health Act, which required her doctors in British Columbia to certify that she had a mental disorder and, among other things, required detention and care in a designated facility to prevent her substantial mental or physical deterioration or for her protection or the protection of others. *See* Mental Health Act, R.S.B.C. 1996, c. 288, s. 22 ("Involuntary admissions"); Kristovich Decl. Ex. 14 at 2–3. Van Rootselaar reportedly underwent "forced interventions," including electroconvulsive (aka "electroshock") therapy. Kristovich Decl. Ex. 15 at 2. She was involuntarily hospitalized under this Act on multiple occasions, and each time, British Columbia mental health care providers released her without apparent ongoing supervision. *Id.* Ex. 14 at 2–3. Family members told reporters they "trusted that the system in place would provide the sustainable support [Van Rootselaar] needed," but "the system failed." *Id.* Ex. 15 at 2. They describe "cancelled appointments, gaps in care, and treatments that were difficult and traumatic." *Id.* Witnesses and evidence concerning the British Columbia public health system's interactions with Van Rootselaar, including her repeated involuntary hospitalizations and releases, are in British Columbia.

### C. <u>Van Rootselaar's Access to Firearms and Ammunition</u>

Despite her arson and mental health crises, Van Rootselaar had ready, publicly known access to firearms. In the year after her arson and related psychiatric hospitalization, her mother publicly posted a photograph of an open household gun cabinet containing at least seven guns—including multiple shotguns and semi-automatic rifles. *Id.* Ex. 16 at 1–3. Her mother promoted similar

content posted by Van Rootselaar, including inviting Facebook friends to watch her child's YouTube videos about "hunting, self-reliance, [and] guns." *See id.* Ex. 17 at 2.

Van Rootselaar reportedly obtained a firearms license at age thirteen. *See id.* Ex. 18 at 1. Although her license expired in 2024, she continued to have access to firearms in her home, including to firearms shown in photographs that her mother posted to social media. *Id.* at 2. The RCMP oversees firearms licenses and registration in British Columbia. *See* Royal Canadian Mounted Police, Firearms, https://rcmp.ca/en/firearms (last visited Oct. 15, 2026).

Van Rootselaar's alleged co-conspirator, recently arrested in Washington State, told investigators that six months before the shooting, Van Rootselaar "stole[] guns and ammunition from her family's gun safe" and "hid[] them in her room in preparation for a mass shooting." Kristovich Decl. Ex. 2 at 6:14-20. The RCMP has not disclosed whether those guns were ever reported missing. Van Rootselaar also allegedly "convinced another person to purchase ammunition on her behalf." *Id.* The identity of that alleged purchaser has not been publicly disclosed.

Evidence concerning Van Rootselaar's firearms license; how she obtained access to guns and ammunition; and why she had ongoing access to firearms after her license expired, after her arson, and after repeated involuntary psychiatric hospitalizations is in British Columbia.

**D. <u>The RCMP's Return of Firearms to Van Rootselaar's Home</u>**

The RCMP knew Van Rootselaar had access to firearms and was unstable before the shooting. The Province alleges that the RCMP "already had an open file" on Van Rootselaar, "had visited [her] residence in response to mental-health concerns," and "had previously removed firearms from the home." B.C. Compl. ¶¶ 8, 106. In fact, the RCMP responded to at least 12 incidents involving Van Rootselaar between 2018 and 2025. *See* Lockhart Decl. Ex. B at 131–32. On the day of the shooting, when the RCMP received calls about an active shooter at the school, one RCMP inspector immediately identified Van Rootselaar as a potential suspect, telling other officers that Van Rootselaar was "obsessed with guns." *Id.* Ex. B at 15. The RCMP is maintaining records regarding each of the 12 incidents involving Van Rootselaar, including the identities of the involved RCMP officers and any witnesses, under seal in British Columbia. *Id.* Ex. B at 131–32.

About "[t]wo years" before the shooting, the RCMP seized firearms from Van Rootselaar's

home; the RCMP later returned weapons to the home but has not publicly disclosed when that occurred. Kristovich Decl. Ex. 19 at 5; *id.* Ex. 9 at 3. According to charging documents, Van Rootselaar told Bryant in December 2025 that one of the seized and returned weapons was her "SKS" rifle. *Id.* Ex. 2 at 18:2–10. Van Rootselaar reportedly discussed with Bryant her plan to use the SKS in the shooting, and an SKS "machine gun conversion device" was among the items that Van Rootselaar used in the shooting. *Id.*; *see also id.* at 6:14-20. The RCMP has stated that two of the four firearms used by Van Rootselaar in the shooting had not been previously seized by the RCMP, but it has been silent as to the others, including the SKS. *See id.* Ex. 20 at 2.

The RCMP's decision to return weapons to Van Rootselaar's home has "angered [Tumbler Ridge] residents, some of whom believe more could have been done to stop the attack." *Id.* Ex. 21 at 4. Law enforcement witnesses and evidence concerning the RCMP's "open file" on Van Rootselaar and the seizure and return of guns to her home are in British Columbia.

**E. <u>The British Columbia Government Response to the Shooting</u>**

In addition to the ongoing RCMP investigation, other government proceedings in British Columbia related to the shooting will overlap with this action.

The British Columbia Chief Coroner has directed a coroner's inquest to publicly review the circumstances surrounding the deaths, assess systemic and procedural issues, and make evidence-based recommendations aimed at preventing similar incidents in the future. *Id.* Ex. 22 at 1–2. The inquest will be a "formal court proceeding[], with a five- to seven-person jury," in which the jury will render findings of fact. *Id.* Ex. 23 at 1. The Chief Coroner has said that the inquest will cover a broad spectrum of issues and will "take a specific focus on mental health services in rural and remote communities, as well as questions around how the weapons used in the shooting were acquired and what role artificial intelligence played." *Id.* Ex. 24 at 1; *see also id.* Ex. 22 at 1–2.

In a recent press conference, British Columbia's Attorney General announced that she is urging provincial legislators to make "changes to the Criminal Code" to impose "accountability for the dangerous actions of AI." *See* B.C. Gov't Provides Update on Tumbler Ridge Legal Action at 04:20 (Sept. 21, 2026), https://www.cpac.ca/headline-politics/episode/bc-govt-provides-update-on-tumbler-ridge-legal-action?id=2bb08388-0ffb-48ab-be7e-aa1a2a663db4. She explained that her

proposed amendments would "set[] up a specific duty of care" such that AI service providers could be held responsible for "serious criminal conduct done by their AI products." *Id.* at 04:53. The Attorney General also criticized other legislation for failing to impose "clear enforceable reporting or disclosure requirements for social media or AI chat bot companies . . . when they become aware of credible threats of violence." *Id.* at 06:00. She emphasized "the government of Canada is best placed to regulate this area." *Id.* at 05:18.

The British Columbia Information and Privacy Commissioner has also publicly stated that his office is monitoring issues related to the Tumbler Ridge tragedy. Lockhart Decl. ¶ 10.

**F. <u>The Canadian Media and Public Response to the Shooting</u>**

Canadian public interest in the shooting and the government response has been significant. Since February 2026, Canadian media have continuously covered the shooting, the role of British Columbia's public health and safety systems, and the federal and provincial governments' responses. Google search rates for "tumbler ridge shooting" since February 2026 have been approximately fifty times higher in Canada than in the United States. Kristovich Decl. ¶ 38; *see also id.* ¶ 39.

Canadians and the Canadian press have raised concerns regarding the British Columbian government "trying to deflect its own culpability" and that "[t]he B.C. justice system and B.C. health system did nothing to flag or prevent the murderer." *Id.* Ex. 25 at 3; *id.* Ex. 26 at 2–5. Experts have criticized systemic "gaps" in British Columbia's public health system and called for "the overlap between firearm and mental health laws . . . to be thoroughly examined." *Id.* Ex. 14 at 2–3.

The RCMP's refusal to disclose information about the weapons Van Rootselaar used in the shooting has drawn widespread public criticism. Commentators have demanded "to know why the killer's family had its guns returned after previously being confiscated from the home." *Id.* Ex. 27 at 3. Canadian gun-control advocacy groups have likewise demanded answers, insisting "Canadians have a right to know how our gun control system worked—or failed to work." *Id.* Ex. 28 at 2; *see also id.* Ex. 38. The Province's elected officials have resisted such demands, asserting a right to "control information" during the investigation. *Id.* Ex. 28 at 3. The Canadian press is suing in British Columbia court for release of records of the RCMP's investigation. Lockhart Decl. ¶ 8.

**G. <u>The Province Files Suit in California</u>**

Less than a month after the shooting, one of the surviving victims, M.G., sued Defendants in British Columbia before discontinuing and refiling in this District, which she did, according to her counsel, to avoid Canadian damages caps. *See* Lockhart Decl. Ex. A; Kristovich Decl. Ex. 29 at 1; *id.* Ex. 30 at 2–4. Thirty-six additional actions by British Columbians followed and were related before the Court.

On September 21, 2026, the Province filed a complaint asserting essentially the same theories of liability as the individual plaintiffs. In addition to sweeping claims for injunctive relief, the Province seeks enormous economic damages to recoup the "extraordinary costs" it allegedly incurred in "mobiliz[ing] a whole-of-government response" to the shooting. B.C. Compl. ¶ 4. These include the costs of deploying dozens of medical and law-enforcement personnel, conducting more than 900 counseling sessions for over 100 children or families, providing medical services to more than 130 adults, establishing continuing five-day-per-week youth mental-health presence, providing victim services, hiring a recovery manager, supplying replacement educators, establishing temporary facilities, and addressing the risk of copycat attacks. *Id.* ¶¶ 31–32. All third-party witnesses and evidence related to these damages claims are in British Columbia.

The Province also seeks as economic damages the costs of "facility remediation" and "demolition" of the entire Tumbler Ridge Secondary School and $200 million for constructing a new "school and wellness center"—projects the federal and provincial governments committed to fund based on "consultations with victims' families, students, teachers, experts and community members." *Id.* ¶¶ 33 & n.14, 35; Kristovich Decl. Ex. 31 at 1. These damages claims raise significant factual issues, as public documents that predate the shooting indicate that the old school building, constructed in 1982, was in "poor" condition and required "immediate attention" to "significant building systems." *See* Kristovich Decl. Ex. 32 at 11–13. All third-party witnesses and evidence related to the pre- and post-shooting condition of the school, the decision to demolish the school before this lawsuit was filed, the community consultations regarding construction of a new school, the federal and provincial funding allocations for construction of a new school and public health and wellness center, and the plans and costs to construct these facilities are in British

Columbia.

The day after filing and widely publicizing this lawsuit, the Provincial government called a snap election—only the second such election since 2001. *Id.* Ex. 33. The incumbent Premier has referenced the lawsuit in campaign stops. *Id.*

Two weeks after the Province filed this suit accusing OpenAI of causing the shooting and demanding hundreds of millions of dollars in damages, it was announced that the RCMP, supported by the BC Prosecution Service and the Department of Justice, along with U.S. law enforcement, had been investigating for the last eight months a co-conspirator who allegedly helped Van Rootselaar plan and execute the attacks, including by providing money and tactical advice, promising to help livestream the attack, and instructing Van Rootselaar how to get her car started so she could drive to the school after murdering two family members. *Id.* Exs. 1–3. The RCMP learned about Bryant from reviewing Van Rootselaar's communications on another online platform, one of many social media and digital platforms from which the RCMP has collected digital evidence that it possesses and continues to analyze in British Columbia. *Id.* Ex. 2 at 5:4–19.

The Province's complaint does not mention Van Rootselaar's co-conspirator or her alleged use of other online platforms in planning the shooting.

## III. <u>ARGUMENT</u>

In deciding a motion to dismiss based on forum non conveniens, the Court considers "(1) whether an adequate alternative forum exists[;] and (2) whether the balance of private and public interest factors favors dismissal." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142–43 (9th Cir. 2001); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22, 257 (1981). The forum non conveniens doctrine recognizes "the practical difficulties that can attend the adjudication of a dispute in a certain locality." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996)).

British Columbia is an available and adequate alternative forum for claims by the British Columbian government and a local school district, and the private and public interest factors overwhelmingly favor dismissal.

**A. British Columbia Is an Available and Adequate Forum**

British Columbia plainly is an available and adequate forum for claims by the Province and a British Columbian school district. A forum is available and adequate if (1) "the defendant is amenable to process there," *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1225 (9th Cir. 2011), and (2) it "provide[s] the plaintiff with some remedy for his wrong," *Lueck*, 236 F.3d at 1143.

Both requirements are satisfied here. First, Defendants will consent to service of process and jurisdiction for this lawsuit if it is refiled in British Columbia. *See Piper*, 454 U.S. at 254 n.22. Second, the Province regularly pursues tort and product liability claims in British Columbia, including against American companies that allegedly have harmed Canadian citizens, such as McKinsey (relating to opioids) and Juul (relating to vaping). Lockhart Decl. ¶ 4; *see British Columbia v. McKinsey & Co., Inc. United States*, Vancouver Registry No. S-2111367 (B.C.S.C.); *British Columbia v. Juul Labs, Inc.*, Vancouver Registry No. 259345 (B.C.S.C.). By contrast, the Province has rarely brought suit in a U.S. court—and this appears to be the first ever suit by the Province against a U.S. company in a U.S. court. Cases brought by the Province in the United States in the last fifty years that Defendants have identified are readily distinguishable. For example, *Her Majesty the Queen in Right of the Province of British Columbia v. Bailey*, No. 90-cv-1118 (W.D. Wash. filed Aug. 10, 1990), is a case against the Washington State Gambling Commissioner and several foreign entities; there are no remaining public records relating to this docket. In *Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson*, 433 F. Supp. 410 (D. Or. 1977), the Province sought to enforce a tax judgment against individuals in the United States. According to the court, that marked "the first time in American legal history that a foreign government ha[d] sought enforcement of a tax judgment in a court of the United States"; the district court dismissed the claims, and the Ninth Circuit affirmed, because it was improper for an American court to enforce Canadian tax law. *Id.* at 411; *Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson*, 597 F.2d 1161 (9th Cir. 1979).

Any argument that British Columbia is not an adequate forum because its law may provide different remedies would fail as a matter of law. Unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all," the availability of

different remedies or a lesser potential recovery does not make a forum inadequate. *See Piper*, 454 U.S. at 247–54; *Lueck*, 236 F.3d at 1143–45 (same). "An alternative forum need not provide all of the remedies and benefits which might be available in an American court, and is not unsuitable because a plaintiff's potential damages award may be smaller." *Ministry of Health, Province of Ont., Can. v. Shiley Inc.*, 858 F. Supp. 1426, 1441 (C.D. Cal. 1994) (finding Canada to be an adequate forum even though certain tort remedies might be unavailable, and dismissing claims by Canadian province on forum non conveniens grounds).

### B. <u>The Balance of Private and Public Interest Factors Favors Dismissal</u>

The private and public interest factors strongly favor a British Columbia forum, and under the governing standard, the Court should not defer to the Plaintiffs' choice of forum, including because those entities can obtain relevant evidence from Defendants in either forum.

#### 1. The Private Interest Factors Weigh in Favor of British Columbia

The private interest factors include "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the costs of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) 'all other practical problems that make trial of a case easy, expeditious[,] and inexpensive.'" *Lueck*, 236 F.3d at 1145–46. These factors strongly favor a British Columbia forum.

***Residence of the Parties and the Witnesses.*** The Province and the School District are British Columbian government entities, and their evidence is there. Canadian law enforcement who have knowledge of Van Rootselaar's criminal history and access to guns before the shooting, as well as the over fifty RCMP officers with firsthand knowledge of the ongoing investigation into the shooting, are in British Columbia. *See supra* at pp. 9, 12–13. The more than 100 witnesses who provided statements to Canadian law enforcement and the physical evidence collected in the investigation are in British Columbia. *See supra* at pp. 9–13. Members of Van Rootselaar's family and the Tumbler Ridge community who have firsthand knowledge of Van Rootselaar's mental health history, violent behavior, drug use, and access to guns are in British Columbia. *See supra* at pp. 10–13. Mental health care providers who have evidence of Van Rootselaar's mental health

treatment, including repeated involuntary psychiatric hospitalizations and releases, are in British Columbia. *See supra* at p. 11. Countless individuals involved in the government's response to the shooting, including the construction of a new school and public health center, are in British Columbia. *See supra* at pp. 13–16.

Defendants are located in California, and so are many of their witnesses. But evidence can be obtained from relevant party witnesses in either forum. *See Lueck*, 236 F.3d at 1146–47 (observing that the parties control party documents and witnesses, so they can be brought to court no matter the forum). Plaintiffs will be able to obtain the evidence they need to prosecute their claims wherever the litigation proceeds. By contrast, the hundreds of percipient, non-party witnesses in British Columbia that are beyond the Court's subpoena power possess unique evidence that is directly relevant to Defendants' causation defense and cannot be replicated by party discovery. *See supra* at pp. 9–16.

***The Forum's Convenience to the Litigants.*** California is not convenient for the hundreds of third-party witnesses described above, or for Plaintiffs' own witnesses (such as School District representatives), who all reside in British Columbia. *See supra* at pp. 9–16. Although litigation in British Columbia would be less convenient for Defendants, they are willing to accept inconvenience to ensure that they can access critical evidence for their defense. This favors dismissal. *See, e.g.*, *Doud v. Kochai*, No. C 12-6061 MEJ, 2013 WL 5313701, at *4 (N.D. Cal. Sept. 23, 2013) (granting dismissal where balance of factors weighed against plaintiffs' chosen forum, even though defendants were based there and it was "more convenient for" defendants to litigate there); *Nibirutech Ltd v. Jang*, No. C 14-3091 PJH, 2015 WL 831465, at *6 (N.D. Cal. Feb. 23, 2015) (similar; granting dismissal in favor of litigating the case in China rather than California, even though defendants resided in California and conducted part of the alleged fraud there).

***Access to Physical Evidence and Other Sources of Proof.*** This factor favors a foreign forum when critical evidence, particularly from non-parties, is beyond the federal court's compulsory process while parties are willing to make their evidence available in the foreign forum. In *Lueck*, the Ninth Circuit affirmed dismissal on forum non conveniens grounds, finding that where evidence was in both the United States and New Zealand, this factor favored dismissal because the

district court could not compel much of the New Zealand evidence, "whereas the parties control, and therefore can bring, all the United States evidence to New Zealand." 236 F.3d at 1146–47. Similarly, in *Umeda v. Tesla Inc.*, the court dismissed claims against Tesla by Japanese plaintiffs arising from a car crash in Tokyo because Tesla could produce evidence in a Japanese action, but it would "be difficult if not impossible for Tesla to compel non-parties to produce evidence located in Japan if the action proceed[ed]" in California. No. 20-cv-02926-SVK, 2020 WL 5653496, at *7 (N.D. Cal. Sept. 23, 2020). Likewise, in *In re Air Crash Over Mid-Atlantic on June 1, 2009*, the court dismissed claims by foreign plaintiffs against U.S. manufacturers because the defendants "agreed to provide all of their evidence" in the foreign forum, whereas it would be "difficult to compel non-parties" in the foreign forum to produce evidence in the U.S.; this imbalance in "access to relevant evidence tip[ped] in favor of dismissal." 760 F. Supp. 2d 832, 844 (N.D. Cal. 2010).

Here, while party evidence is located in both California and British Columbia, third-party evidence that is critical to Defendants' ability to contest Plaintiffs' claims is overwhelmingly located in British Columbia. Authorities in British Columbia continue to gather potentially relevant evidence through the RCMP's ongoing criminal investigation, which to date has reportedly involved over 100 witnesses and over fifty RCMP officers, and more evidence will be collected in Canada in the forthcoming Coroner's investigation and inquest. *See supra* at p. 9–10, 13. The RCMP also possesses physical and digital evidence of Van Rootselaar's activities on other online platforms, including the Discord communications with Bryant which triggered the U.S.-Canadian law enforcement investigation into Bryant—all of which is beyond the Court's subpoena power. *See* Kristovich Decl. Ex. 2 at 5:4–19. Hundreds of additional individuals have been involved in the Province's and the School District's post-shooting efforts, including counseling programs, the decision to destroy the existing school, and construction of a new school and public health center in Tumbler Ridge. *See supra* at pp. 15–16. These sources of proof bearing directly on the causes of the shooting and allegedly resulting damages cannot be replicated by party discovery, particularly given that neither the Crown nor the School District control the participation in a civil lawsuit of the RCMP, Coroner's Service, or any individual civilian witness. *See* Lockhart Decl. ¶¶ 7, 9; *see also* B.C. Compl. ¶ 8 (acknowledging the RCMP is a separate entity that contracts with the Province to

provide policing services). These third parties, who possess critical causation evidence, are unlikely to cooperate voluntarily with a California proceeding.

The Court cannot compel production of evidence held by Canadian third parties. *See Lueck*, 236 F.3d at 1147. Defendants instead would have to seek this third-party evidence through letters rogatory, a process that is "lengthy and burdensome." *Gallego v. Garcia*, No. 07CV1185-MMA (LSP), 2010 WL 2354585, at *4 (S.D. Cal. June 9, 2010); *see Andersen v. Stability AI Ltd.*, No. 23-cv-00201-WHO (LJC), 2026 WL 1244041, at *2 (N.D. Cal. May 6, 2026) (describing letter-rogatory process for obtaining evidence from third parties in Canada). Defendants would first have to move the Court to issue letters rogatory. *See* 28 U.S.C. § 1781. If the Court issues the letters, Defendants would then have to apply to a British Columbia court to enforce the letters, a time-intensive process in which the court will closely scrutinize the requests and may decline to enforce them. Lockhart Decl. ¶¶ 11–18. Defendants will therefore have to seek British Columbia judicial process even if these actions remain in this District—with no guarantee that the evidence they seek will be compelled—an unnecessary duplication of proceedings across borders that could be avoided by litigating these actions in British Columbia.

Defendants also face a heightened risk of extensive delays and non-enforcement of letters rogatory here because the requested materials will include medical, psychiatric, law enforcement, and government records subject to privacy laws in British Columbia. *Id.* The ongoing criminal investigation, the pending Coroner's investigation, and other proceedings in British Columbia may create additional evidentiary complexities in seeking to enforce letters rogatory, including potential restrictions on or delayed access to investigative materials. *Id.* ¶¶ 17–21. A British Columbia court responsible for resolving these cases would be substantially better equipped to navigate parallel matters in British Columbia and to balance British Columbian laws and policy interests with the parties' discovery needs in the litigation. *Id.*

***Whether Unwilling Witnesses Can Be Compelled to Testify.*** Similar problems will extend to trial testimony. Defendants could not compel live testimony of third-party witnesses residing in British Columbia at a trial in California, leaving Defendants to rely on whatever deposition

testimony of those third parties Defendants may be able to obtain.[2] *See In re Air Crash at Madrid, Spain, on August 20, 2008*, 893 F. Supp. 2d 1020, 1032 (C.D. Cal. 2011). As the Supreme Court recognized in *Gulf Oil Corp. v. Gilbert*, trying a case "where litigants cannot compel personal attendance and may be forced to try their cases on deposition . . . create[s] a condition not satisfactory to court, jury or most litigants." 330 U.S. 501, 511 (1947). That concern is especially significant here, where the credibility and firsthand knowledge of hundreds of witnesses, law enforcement officers, mental health care providers, and Van Rootselaar's family and community members in British Columbia—none of whom can be compelled to testify at a trial in California—will be central to how the jury evaluates the core issues of causation and comparative fault.

By contrast, party evidence would be equally available if this action proceeds in British Columbia. British Columbia courts can compel, Lockhart Decl. ¶¶ 19–23, and OpenAI will make employees available for testimony in this litigation, whether it proceeds in the Northern District of California or in Canada, subject to applicable discovery and trial rules. Defendants will not object to relevant witnesses testifying at a trial of this action in British Columbia on the ground that Defendants' witnesses reside outside of British Columbia. And it would not be more burdensome for Plaintiffs to take discovery from Defendants if this action were pending in British Columbia: the vast majority of Defendants' records are likely to be produced electronically. British Columbia offers far greater access to the third-party evidence, including physical evidence, without impeding Plaintiffs' access to Defendants' evidence.

***The Costs of Bringing Witnesses to Trial.*** It would be less expensive for Plaintiffs to bring witnesses concerning their claimed injuries and damages to trial in British Columbia. It would be less expensive for Defendants' own witnesses to appear in California, but far more expensive for Defendants to attempt to compel the numerous third-party British Columbian witnesses that they likely will call to testify at a trial in California. *See supra* at pp. 9–16. This factor favors dismissal.

***The Enforceability of the Judgment.*** A British Columbia judgment against Defendants

---

[2] Because Van Rootselaar's alleged co-conspirator Bryant is located neither within California nor within 100 miles of the Court, she is beyond the Court's subpoena power, Fed. R. Civ. P. 45(c), and the parties likely cannot compel her testimony at trial in this District or in British Columbia.

would be enforceable in British Columbia, Lockhart Decl. ¶ 24, just as a California judgment would be enforceable in California. This factor is neutral.

***Practical Problems That Make Trial Easy, Expeditious, and Inexpensive.*** The practical considerations of trial favor British Columbia because litigating there would provide both sides with meaningful access to relevant evidence, whereas litigating here would impede Defendants' access to third-party evidence that is critical to the issues of causation and comparative fault. *See supra* at pp. 19–22. Additionally, given multiple overlapping proceedings in British Columbia, including the ongoing RCMP investigation and the Coroner's inquest, *see supra* at pp. 9–10, 13–14, litigating the Province and School District's claims in this forum would likely lead to "duplication of cost and effort" and risk "inconsistent rulings," which "weighs heavily in favor dismissal." *See Juniper Networks, Inc. v. Andrade*, No. 20-cv-02360-BLF, 2021 WL 3514103, at *12 (N.D. Cal. Aug. 10, 2021). The private interest factors weigh decisively in favor of British Columbia.

### 2. British Columbia's Predominant Interest and Considerations of International Comity Favor a British Columbia Forum

The public interest factors include "(1) [the] local interest of [the] lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum." *Lueck*, 236 F.3d at 1147. These factors likewise strongly favor British Columbia.

***Predominant Local Interest.*** British Columbia, not California, has the predominant local interest in this litigation, as demonstrated by the response to the shooting and the filing of this lawsuit by the Crown in Right of British Columbia. There is "'intense' Canadian public interest" in the RCMP's ongoing investigation involving hundreds of participants and witnesses, Kristovich Decl. Ex. 34 at 2, including a months-long joint investigation by Canadian and U.S. law enforcement into Van Rootselaar's alleged co-conspirator Bryant, which was "supported throughout by the BC Prosecution Service and the Department of Justice," *id.* Ex. 3 at 3. The British Columbia Coroner also will conduct an investigation and public inquest into the causes and circumstances of the shooting. *Id.* Exs. 22, 24. Further underscoring the foreign interest, in the wake of the shooting, Canada's Parliament has been considering legislation addressing online platforms and AI chatbots.

*See, e.g.*, Bill C-34, *The Safe Social Media Act*, Gov. of Can., https://www.canada.ca/en/canadian-heritage/services/safe-social-media-act.html (last modified Sept. 8, 2026).

Plaintiffs' claims will require examining the same questions about Canadian and British Columbian institutions and standards that are the subject of ongoing Canadian proceedings; courts and jurors in British Columbia are best equipped to consider these institutional and policy issues and to ensure consistency across proceedings related to the shooting. Indeed, litigating this case here puts the Court and San Francisco jurors in the untenable position of sitting in "judgment on the acts of the government of another [country] done within its own territory." *See West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 828 (9th Cir. 1987) (citation omitted) (discussing act of state doctrine); *see also Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.,* 176 F.R.D. 329, 349 (C.D. Cal. 1997) ("The act of state doctrine precludes a court of the United States from considering a plaintiff's claims where either the claims or the defenses asserted would require the court to determine that a foreign sovereign's official acts performed in its own territory were invalid").

Evaluating Plaintiffs' claims, and OpenAI's defenses, necessarily will require assessing the conduct, standards, and regulations of the Canadian and British Columbian governments. For example, the jury may need to determine, among other questions, whether Canadian law enforcement acted reasonably in returning guns to the home of a mentally unstable teenager who had recently committed arson in an attempt to kill her family and had repeatedly been involuntarily hospitalized under British Columbia's mental health legislation. This inquiry may turn on Canadian and British Columbia statutes, gun control policy, and community practices—which differ from those in California and the United States—and whether the government complied with those statutes, policies, and practices.[3] *See Bullis v. Sec. Pac. Nat'l Bank*, 21 Cal. 3d 801, 809 (1978) ("The standard of care required in a particular circumstance may be based on a statute . . . or the custom and practice in the relevant community."); *see also* Kristovich Decl. Exs. 28, 38. "It would

[3] For example, California prohibits firearm possession for five years following certain involuntary psychiatric holds based on a danger to self or others. *See* Cal. Welf. & Inst. Code § 8103(f)(1)(A). British Columbia does not have a similar brightline prohibition; mental health and behavioral history are merely factors that may be considered in determining eligibility for a firearms license. *See* Firearms Act, S.C. 1995, c. 39 (Can.). Van Rootselaar's serious mental health problems and criminal history did not impact her license status.

be sadly paternalistic, if not misguided, of this Court to attempt to evaluate the regulations and standards imposed in a foreign country." *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984*, 634 F. Supp. 842, 864 (S.D.N.Y. 1986); *see also In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 741, 748 (E.D. La. 2006) (similar); *Seguros Universales, S.A. v. Microsoft Corp.*, 32 F. Supp. 3d 1242, 1251–52 (S.D. Fla. 2014) (dismissing for forum non conveniens where case would require court "to question and second guess the integrity, viability, and propriety of the Guatemalan justice system"). The RCMP's return of weapons to Van Rootselaar's home before the shooting is one of many issues that will require the Court and San Francisco jurors to pass judgment on the laws, customs, and practices of foreign sovereigns.[4]

British Columbia's "extremely high" interest in the litigation also is reflected by the "significant attention" the shooting "and its aftermath, including the . . . investigation, the post-investigation activity, and the various legal proceedings," have received in Canadian media. *Lueck*, 236 F.3d at 1147. Canadian reporting has focused on the conduct of Canadian and British Columbian institutions that preceded the shooting, including the RCMP's prior interactions with Van Rootselaar, its return of her guns before the shooting, and the adequacy of the provincial and local mental health system. *See, e.g.*, Kristovich Decl. Ex. 17 at 1–6. That coverage has called for scrutiny of "both the role of AI and the performance of [British Columbia's] public institutions," including potential failures by Canadian law enforcement and public health systems. *Id.* Ex. 26 at 3, 5; *see also id.* Ex. 35 at 1, 4 (calling for "transparency" regarding return of shooter's seized guns, and noting issues concerning health care resources in Tumbler Ridge). These sensitive questions affecting British Columbian public policy should be considered by courts and jurors in British Columbia, not San Francisco. As indicated by the significantly higher rate of Google web searches for "tumbler ridge shooting" in Canada than in the United States since the shooting, *see* Kristovich

[4] That the British Columbian government filed this lawsuit does not eliminate this issue. The *Union Carbide* case involved claims by the Indian government, yet the court concluded it was "not the appropriate tribunal to determine whether the Indian regulations were breached, or whether the laws themselves were sufficient to protect Indian citizens from harm." 634 F. Supp. at 864; *cf. RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 346–49 (2016) ("reject[ing] the notion that we should . . . permit extraterritorial suits based on a case-by-case inquiry that turns on or looks to the consent of the affected sovereign").

Decl. ¶¶ 38–39, there is unquestionably "a local interest in having localized controversies decided at home." *Piper*, 454 U.S. at 260 (citation omitted); *see also Ministry of Health*, 858 F. Supp. at 1441–42 (tort claims by Canadian provinces against U.S. companies for alleged harms to Canadians belonged in Canada).

Undoubtedly, California has an interest in the conduct of companies that, like OpenAI, are headquartered in the state.[5] *See* B.C. Compl. ¶¶ 16–19. But California's general interest in regulating resident companies pales in comparison to the palpable interests of British Columbia in adjudicating claims arising from this specific mass murder of British Columbia residents by a British Columbia resident that occurred in British Columbia. *See Piper*, 454 U.S. at 260–61 (American interest in conduct of American manufacturers "simply not sufficient to justify the enormous commitment of judicial time and resources" of adjudicating claims by foreign plaintiffs arising from an accident abroad); *Kryvicky v. Scandinavian Airlines Sys*., 807 F.2d 514, 517 (6th Cir. 1986) ("[T]he country where the injury occurred has a greater interest in the ensuing products liability litigation than the country where the product was manufactured.").

***Court's Familiarity with Governing Law.*** Plaintiffs' claims also will require examining Canadian and British Columbian laws, which British Columbia courts are best equipped to do. *See Lueck*, 236 F.3d at 1148 n.6 (concluding that likely application of foreign law weighed in favor of dismissal); *Etaliq, Inc. v. Cisco Sys., Inc.*, No. CV 11-3672 GAF (FFMx), 2011 WL 13220445, at *6–7 (C.D. Cal. July 20, 2011) (finding likely application of Canadian law to one claim, as well as the need to "apply Canadian law to 'untangle' . . . complicated choice of law question" on the other claim, weighed in favor of dismissal).

The Court need not determine now that Canadian or British Columbian law will govern any particular issue; the mere possibility that foreign law will apply is enough for this factor to favor dismissal. *See Air Crash Over Mid-Atlantic*, 760 F. Supp. 2d at 847 (citing *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 662 (9th Cir. 2009)) ("[T]he possibility that French law will apply is an additional factor favoring dismissal."); *see also Lisa, S.A. v. Gutierrez Mayorga*,

[5] None of the publicly available facts suggests the State of California has any interest in the criminal prosecution of Bryant by the U.S. Attorney's Office in the Western District of Washington.

441 F. Supp. 2d 1233, 1240 (S.D. Fla. 2006) (noting that the court "need not make an explicit finding as to which country's law applies," but finding that "it is probable that Guatemalan law" applied because the injury-causing conduct occurred in Guatemala, the domicile of nearly all parties was Guatemala, and the "place where the relationship between the parties is centered" was Guatemala). Given that this action involves the British Columbia sovereign asserting tort claims arising from a shooting that occurred in British Columbia, seeking as damages costs that were incurred in British Columbia, there is a possibility that the Court will have to apply Canadian and British Columbian law to at least some substantive issues in this case. For example, the Court will have to determine whether and to what extent British Columbian governmental entities are entitled to economic damages for the asserted tort claims, which likely will involve grappling with complex, novel questions of British Columbia law, including: (i) whether the government's pursuit of damages in this case requires statutory authorization; and (ii) if not, whether the government may pursue those damages through a suit filed in a foreign jurisdiction. *See* Lockhart Decl. ¶ 5; *cf. British Columbia v. McKinsey & Co., Inc. United States*; Vancouver Registry No. S-2111367 (B.C.S.C.) (case involving claims under British Columbia's Opioid Damages and Health Care Costs Recovery Act).

Even if Canadian and British Columbian law did not apply to any substantive issue here, the Court likely would need to instruct the jury on aspects of Canadian and British Columbia law, such as firearm seizure laws and mental health legislation, that bear on the standard of care. *See Silverlake Park LLC v. Stewart Title Guar. Co.*, No. 2:17-cv-03291-CAS-AGRx, 2025 WL 241118, at *3 (C.D. Cal. Jan. 10, 2025) (holding that, although California law applied, Texas customs, standards, procedures, and practices were relevant in determining the standard of care in the Texas escrow industry). The Court also may need to apply Canadian and British Columbian law to determine what, if any, privileges or immunities apply to Plaintiffs in light of their status as British Columbian governmental entities. Lockhart Decl. ¶ 6.

Given the strong likelihood that the Court will need to apply and decide at least some issues under Canadian and British Columbian law, including some issues of first impression in those jurisdictions, Lockhart Decl. ¶ 5, this factor heavily favors dismissal. *See Juniper Networks*, 2021 WL 3514103, at *6 ("Although this Court is capable of applying Canadian law, such application

would impose a substantial burden on both the Court and the jurors, to research, understand, and apply the foreign law." (citation omitted)); *Seguros Universales*, 32 F. Supp. 3d at 1251 (application of foreign law to many of plaintiffs' claims weighed in favor of dismissal); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 953 (11th Cir. 1997) (affirming forum non conveniens dismissal of RICO claims brought by the Republic of Panama in part because the district court would have to apply Panamanian law).

***Burden on Court and Local Jurors.*** The burden on this Court and local jurors strongly favors dismissal. Forum non conveniens helps to prevent burdening local courts and juries with litigation that concerns claims asserted by foreign residents or arising from conduct abroad. *See Gulf Oil*, 330 U.S. at 508–09. If this case, along with the thirty-seven related lawsuits currently pending before the Court, were to proceed in this forum, San Francisco jurors would be required to resolve 38 separate lawsuits by residents of British Columbia and the Crown in Right of British Columbia, His Majesty King Charles III, arising from a shooting by a British Columbian in British Columbia. And the Court would have to manage and coordinate complex proceedings across thirty-eight actions,[6] supervise extensive international discovery, and examine and potentially apply Canadian law to multiple issues. These unnecessary burdens are what the doctrine of forum non conveniens is intended to avoid. *See Piper*, 454 U.S. at 261 (explaining that U.S. interest in a product liability action against a U.S. manufacturer for an accident that occurred abroad and involved foreign victims was "simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here"). "Plaintiffs . . . are Canadians, and it is reasonable for Canada to incur the expense of a trial involving its own citizens." *Ministry of Health*, 858 F. Supp. at 1442.

***Court Congestion and Costs of Resolving a Dispute Unrelated to This Forum.*** While these factors may not weigh as heavily as others, this is a congested court by any measure. This District saw a significant increase in filings in 2025, and time to trial can be longer than in less congested

[6] There are procedural mechanisms to coordinate the management of these related cases in British Columbia. *See, e.g.*, B.C. Supreme Court Civil Rule 22-5 (8).

districts.[7] Litigating the Crown's lawsuit—in addition to the thirty-seven related cases brought by individual plaintiffs—is likely to impose significant costs on the Court, as it will require intensive case management, significant motion practice, and likely cross-border discovery disputes.

**3. Plaintiffs' Choice of Forum Is Entitled to Limited Deference**

That the Crown and the School District, British Columbian government entities, chose to sue in California merits limited deference, for two reasons. First, "a foreign plaintiff's choice deserves less deference" under the applicable legal standard because the assumption that the chosen forum is convenient for a foreign plaintiff is "much less reasonable." *Piper*, 454 U.S. at 255–56; *see also Lueck*, 236 F.3d at 1145 ("the showing required for dismissal is reduced" for foreign plaintiffs); *Ministry of Health*, 858 F. Supp. at 1442 (Canadian provinces' "choice to file in California is not a substantial factor"). Second, a plaintiff's chosen forum is "entitled to little deference" where there are signs the forum was selected for strategic reasons. *Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 694–95 & n.10 (9th Cir. 2009). There are indicia of strategic forum selection here, given that the Province, apparently for the first time, and on the eve of an election, filed tort claims against a U.S. company in an American court, instead of in its own courts as it has historically done. *See supra* at pp. 16, 17. The Province's strategic attempt to avoid its own courts and laws here is not entitled to deference.

## IV. <u>CONCLUSION</u>

The Court should dismiss this action for forum non conveniens.

DATED: October 15, 2026

MUNGER, TOLLES & OLSON LLP

By: */s/ Bethany W. Kristovich*
BETHANY W. KRISTOVICH
Attorneys for Defendants
OpenAI Foundation, OpenAI OpCo, LLC, OpenAI Holdings, LLC, OpenAI Group PBC, and Samuel Altman

[7] *See* U.S. District Courts, Federal Court Management Statistics–Profiles (Dec. 31, 2025), https://www.uscourts.gov/sites/default/files/document/fcms_na_distprofile1231.2025.pdf.